IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH B. ABNEY, )
)
    Plaintiff, )
)
v. ) No. 05 C 5582
)
THOMAS MONAHAN, et al., in their )
individual and official capacities, )
)
    Defendants. )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph Abney ("Abney") has brought claims under 42 U.S.C.A. § 1983 (2006) against various personnel of the Treatment and Detention Facility for Sexually Violent Persons in Joliet, Illinois ("TDF"). Abney was a civilly committed resident of TDF and alleges that TDF personnel failed to separate him from his roommate (referred to here as "D.F.") although he complained to them that D.F. made sexual advances toward him and physically threatened him. Abney claims that as a result of this failure, D.F. attacked and sexually assaulted him in their shared room. Defendants have filed a joint motion for summary judgment. I grant their motion.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087,

1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to Abney, the non-moving party, and draw all reasonable and justifiable inferences in his favor. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants have moved to strike Abney's responses to their Local Rule 56.1 statement of facts. Many of Abney's responses do not conform to Local Rule 56.1(b)(3) because they do not contain specific references to affidavits, parts of the record, or other supporting materials, or are argumentative or contain improper legal conclusions. I will not consider the portions of his responses that do not comport with the local rules.[1]

## II.

From the parties' pleadings and the record before me, the facts are as follows:[2] at all times relevant to Abney's claims, he

---

[1] In addition, defendants note that Abney has not filed his own statement of additional facts, and further object that Abney responded to their statement of facts with an affidavit providing additional factual information in opposition to defendants' motion for summary judgment. I will not consider any facts provided by Abney which do not comply with the local rules or would be inadmissible at trial. However, as Abney is proceeding *pro se*, I have analyzed the record to determine if it contains facts that would provide a dispute of material fact such that summary judgment would be inappropriate.

[2] Abney previously moved for a temporary restraining order and a preliminary injunction to force defendants to transfer him to a different unit within TDF to protect him from further harm. The parties attended a portion of an evidentiary hearing (the "hearing") on this motion during which several witnesses, including Abney, Monahan, Sanders, Dr. Jumper, and others testified. The parties reached an agreement and Abney withdrew his motion prior to the conclusion of the hearing. The transcript of this hearing is

2

was a civilly-committed resident of TDF.[3] Defendants all worked in various capacities at TDF. Thomas Monahan ("Monahan") was the Facility Director. Abney alleges that Monahan received copies of incident reports at the facility, including the incident report concerning D.F.'s threat against him, although he presents no evidence that this is the case.[4] Darrell Sanders ("Sanders") was the Director of Security. Tarry Williams ("Williams") was an Internal Investigator II who was responsible for investigating incidents within TDF. Steve Strock ("Strock") and John Tribble

---

the primary source of facts relied upon by both parties for this summary judgment motion. Since that hearing addressed slightly different factual issues than those necessary to prove Abney's claims, and because Abney has not provided his own statement of facts or submitted additional evidence (other than his affidavit) for this court to consider in ruling on defendants' motion, the factual record is sparse. It does not explain, for instance, how certain defendants played a role in assessing Abney's complaints about D.F. prior to the alleged attack.

[3]Abney was committed under the Sexually Violent Persons Commitment Act, 725 ILL. COMP. STAT. ANN. 207/1 et seq. (2006)(the "SVPA"). Under the SVPA, "sexually violent persons" are subject to involuntary civil commitment. Id. The SVPA defines a "sexually violent person" as one "who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." Id. at 207/5(f).

[4]Monahan did testify at an earlier hearing in this litigation that he was aware that Abney requested a room change by filing a grievance, and that he "referred that to the behavior and rooming committee for a decision" but did not participate in the decision. It is not clear from his testimony whether he was referring to Abney's complaint about D.F.'s threats or his complaint that D.F. had sexually assaulted him.

("Tribble") were Security Therapist Aids.[5] Dr. Shan Jumper ("Dr. Jumper") was the Clinical Director of TDF's treatment program, but had previously served as the Associate Clinical Director and was transitioning from that position to Clinical Director around the time that the events at issue in Abney's lawsuit took place. Lea Chankin ("Dr. Chankin") was the Associate Clinical Director who replaced Dr. Jumper in his position. Jeff Clausen ("Clausen") was a Primary Therapist, and Abney contends Clausen was his primary therapist. Cathy Watkins ("Watkins") was a Team Leader responsible for supervising therapists; Abney contends that Watkins was the team leader for his primary therapist.

Most residents of TDF are housed in double-occupancy rooms. Residents of TDF are locked inside their rooms at certain times, including for certain resident checks. Decisions about how to assign residents to rooms are made by the TDF Rooming Committee. At the time relevant to this complaint, the Rooming Committee was composed of the Associate Clinical Director (then Dr. Jumper), an assigned security executive, and a rotating member of treatment middle management (at the Team Leader level). Abney contends that at the times relevant to his complaint the Rooming Committee was composed of Drs. Jumper and Chankin, Tribble, Strock, and Clausen.

---

[5]There is a dispute about Strock's actual position. A TDF witness testified that at the time of the hearing Strock was a "PSA 2" and Abney also contends, without a citation to the record, that Strock was a "Public Service Administrator (PSA)."

Dr. Jumper testified at the hearing that when an incident occurs that requires the Rooming Committee to meet, it gathers information and then discusses whether a move is warranted. He testified that this is complicated because moving one resident requires shifting other residents to new room assignments. According to Dr. Jumper, the Rooming Committee determines whether roommates are compatible by assessing smoking status, medical concerns, clinical reasons (whether certain residents are aggressive or are vulnerable), prior roommate issues, resident preferences, and space issues. If a TDF resident asks to be separated from his roommate, Dr. Jumper testified that the resident is supposed to raise this issue with his primary therapist or submit a written request to the Rooming Committee. Typically the primary therapist would first speak to the resident and try to resolve the issue without a move, but if "things continue to escalate" then TDF would consider a move for one or both residents. Monahan also testified that TDF does allow for expedited moves; TDF policy allows for urgent moves "pending resident room changes requiring urgent attention due to a potential threat to a resident."

TDF also has a Behavior Committee that reviews "incidents" referred to it by staff reports, allows residents to present information to it about an incident in which they are involved, and makes recommendations and findings. This is a combination of a

5

"disciplinary and clinical process." At the time relevant to Abney's complaint, the Behavior Committee was composed of the Associate Clinical Director,[6] the Team Leader of the treatment team for the relevant resident, and a security executive.[7] Abney contends that at the time of this incident those on the Behavior Committee included Drs. Jumper and Chankin, Watkins, and Tribble.

On August 11, 2005, an incident occurred between Abney and D.F. ("the August 11 incident"). Abney testified at the hearing that at the time of this incident he had shared a room with D.F. for about two months. He testified that he was in his room with D.F. when D.F. asked him to have sex, but Abney refused. Abney testified that D.F. then "said that he should kick my ass because I disappointed him because I wouldn't have sex with him." According to Abney, D.F. said that he was "just joking" with Abney, but Abney took this seriously and not as a joke. Abney testified that he told Tribble, Security Therapeutic Aide Tina Eckdahl, and "Sergeant Humphrey" about the threat and requested to be "removed from the room." Abney testified that when he informed Sanders,

---

[6] Dr. Jumper testified at the hearing that this would have been himself and Dr. Chankin, as he transitioned into the director's role and trained Dr. Chankin to replace him.

[7] Dr. Jumper testified at the hearing that the security executive on the Behavior Committee at that time was "Miss Isham" who has since retired. He testified that she "would have been involved in the discussions during the incident in question."

6

Strock and Williams about the threat he was told that "nothing could be done until [D.F.] physically attacked [him]" because "they could not prove anything."

Eckdahl, who is not a defendant in this case, submitted a written "Incident Report" on August 15, 2005 that confirmed that Abney had asked to speak to an "STA II" because D.F. "had made sexual comments towards him last nite [sic]." Abney also prepared a written statement that Eckdahl submitted along with her report. Abney wrote:

> On [August 10, 29005 at 11:00 pm my cell resident [] and myself were in our cell talking, while we were talking, he started the conversation to one of a sexual nature he asked me "what my sexual orientation was" and I replied that I was a Bi-sexual, he then asked me "what all sexual behaviors I have done in my life," I avoided the question, and stated to him assertively "that I did not wish to engage in any form of sexual behavior [with] anyone," when he asked "why" I told him, "because I have other concerns in my life and sex had no place in it." He then asked me again "why," I told him, "For me to even engage that type of though[t], it would only be in a real relationship outside of this facility." He then stated "Well you can still have sex", I again told him "no." after this final "no" from me, he stated "man you dis[s]apointed me," I then asked him, "Exactly what he meant" he then stated "Because of my answers to his questions" and after the conversation had ended, he stated that he was going to kick my ass in a joking manner but I do not & did not feel comfortable with that comment. And at 8:20 am on 8/11/05 I reported this incident to STA II Eikdhale & asked to speak with Seargeant about this incident. I then spoke to Sergeant Humphrey & [later] to AOD Tribble, then to D-Unit Team Leader Ms.

7

> Wahtkins. I was [later] asked by STA II Mrs.
> Eikdal to write out what happened last night
> for her writeup of this incident.

Eckdahl's report included an entry on a line labeled "AOD ADDENDUM" stating "Forwarded to Behavior Committee" and an entry on a line labeled "Administrative Assessment" labeled "Refer a copy to Ms. Watkins and the Rooming Committee."

Sanders testified that he was aware after this report that Abney wanted to be moved to a different room. He stated that he referred the situation to the Rooming Committee and to Abney's primary therapist because he recognized that Abney "had established concerns." He said that the decision not to separate Abney and D.F. was "a judgment from the treatment team." Sanders said that the security staff "made their determination based upon evidence that is presented to them," but at that time the security team had no evidence that Abney was not adequately protected.

Dr. Jumper testified that he reviewed Abney's written statement a few days after Abney prepared it. Dr. Jumper stated that at that time he did not view D.F.'s statements as a threat to Abney. He stated:

> Well, I think in the context of the entire
> conversation, I believe this would have
> occurred after, shortly after they were placed
> in the room together. It appears to me from
> this account that [D.F.] is essentially
> testing the boundaries, so to speak, to kind
> of see if Mr. Abney is willing to engage in
> any kind of consensual sex activities.

8

Dr. Jumper further stated that he did not believe D.F. presented a serious threat of imminent harm to Abney:

> It's not an uncommon situation for something like this to be reported at the facility. We have a population of residents as a whole that are highly sexualized, and in fact, a good portion of the attention that we pay to rooming assignments and different placements have [sic] to do with the issue of sexual acting out. Sexual misconduct is a rule violation, it's not allowed at the facility.
>
> We do find frequently that the residents that we treat will test each other to see if any of them will engage, are willing to engage in any type of sexual behaviors. A situation such as this is not uncommon, and our response at the time, whenever we run into a situation like this, would have been, you know, certainly it was definitely appropriate and a wise decision on [Abney's] part to bring that to our attention. The direction would have been to speak with either the team leader or the primary therapist with [Abney, and with D.F.] in particular to review the rules of the facility, that we know that this conversation occurred and to remind him that sexual behavior is not allowed in the facility and that he's to refrain from making similar kind of comments or attempting, you know, anything along those lines further.

On September 4, 2005, Abney reported to TDF staff that he had been sexually assaulted by D.F. ("the September 4 incident"). He testified at the hearing that he and D.F. were in their room when D.F. pulled the curtain over the door shut, and then walked over to Abney's bed where Abney was sitting (Abney had the bottom bunk, with D.F.'s bunk overhead). This occurred during the time that the TDF was taking count of residents, so Abney and D.F. were locked

9

inside their room. Abney testified that he "sat up and looked at [D.F.] because he had this weird look on his face." He testified that he asked D.F. "what the matter was, and [D.F.] lunged for [Abney], grabbing [him] by the shoulders." He testified that the two struggled, but that D.F. pinned him to the wall, and put his hand down the back of Abney's pants and grabbed his penis.

Abney tried to push him away but testified D.F. "put me down on my back and pinned me and put his hand [] across my throat, and that's when he physically got his hands inside my sweat pants and grabbed hold of my penis." He testified that because D.F. had his hand over his throat he was not able to scream. Abney said that the attack lasted about five minutes, and that when it was over D.F. "stood up and looked at me and asked me if I was okay and told me, 'Well, it's all going to be alright,' and was laughing about it." Abney testified that when he was able to leave he went to the "chow hall" to try to eat, but could not. He testified that he went back to his unit and reported the incident to TDF staff. At that point, he was taken to Tribble's office. The parties agree that after the incident D.F. was placed in an observation cell, and when he was released he was placed in a different room from Abney. D.F. was also disciplined for the incident. Abney testified that his sweat pants were ripped during the attack, and that Williams took the pants as evidence. Abney filed a grievance concerning the September 4 incident shortly thereafter.

Williams testified that Sanders called him to investigate the September 4 incident after it occurred. He interviewed both Abney and D.F. and collected the sweat pants, and also made a report to Sanders. He also testified that he contacted an investigative unit of the Illinois State Police to perform a further investigation. No criminal charges were filed against D.F., though the TDF did find him guilty of a "major rule violation."

Abney testified at the hearing that the August 11 incident was the only time D.F. had made a threat against him. He further testified that he told TDF staff other times prior to September 4 that he "was uncomfortable being in that cell, I wanted out of that cell, I wanted to be moved."

Dr. Jumper testified that the TDF has between five and ten incidents every week in which one resident threatens another resident. He also testified that "[i]f every time one resident threatened another, [TDF] had to move one of the residents to a different unit. . . it would effectively shut [the clinical program] down" because TDF would "run out of units to put people on."

Abney subsequently filed a *pro se* complaint against defendants bringing claims under § 1983. Abney alleged that he spoke to Sanders, Strock, Tribble, Williams, Clausen, and Watkins about D.F.'s sexual advances and "threats of physical and sexual assault" but that "nothing was done." Defendants have now moved for summary judgment on Abney's claims.

11

### III.

Abney's complaint alleges that defendants failed to protect him from an attack by D.F. and that defendants showed deliberate indifference to his safety in violation of § 1983. To state a claim under § 1983, Abney must show that he was deprived of a federal right, privilege or immunity by a person acting under color of state law. *Id.* In their motion for summary judgment, defendants argue that they did not deprive Abney of a federal right as he claims. Abney was civilly committed under the SVPA at the time of the alleged attack, so his failure to protect claim is governed by the Fourteenth Amendment. *See Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (overturning dismissal of claim brought by TDF resident who alleged personnel failed to protect him from attack by fellow resident); *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003) (affirming summary judgment for sheriff on claim that he failed to protect pre-trial detainee from beating by fellow inmates of county jail). However, the failure to protect standard under the Fourteenth Amendment is practically the same as the standard under the Eighth Amendment, so "§ 1983 claims brought under the Fourteenth Amendment are to be analyzed under the Eighth Amendment test." *Brown*, 398 F.3d at 910 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999)). Therefore, to establish his failure to protect claim, Abney must show that he was committed "under conditions posing a substantial risk of serious harm" and that defendants were deliberately indifferent to his

safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These are questions for a jury, unless no reasonable juror could have concluded that defendants recognized that D.F. posed a substantial risk to Abney. *Ricardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004).

Defendants also argue that Abney's claims against Drs. Jumper and Chankin and against Clausen, Abney's primary therapist, should be analyzed under the standard for claims against professional decisionmakers since those defendants, because of their training and experience in treating sex offenders, exercised professional judgment in determining how to address Abney's concerns. Under the professional judgment standard, courts must "show deference to the judgment exercised by a qualified professional." *Youngberg v. Romeo*, 257 U.S. 307, 322 (1982). This means that decisions made by professionals are

> presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323. The Supreme Court in *Youngberg* defined a "qualified professional" as "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323 n.30. Here, Abney does not contest that this standard should apply but cites to *Brown*, in which the court held that "no 'accepted professional judgment, practice, or standards' would

13

allow a professional to act in deliberate indifference to a substantial risk of serious harm to a detainee in his or her care." *Brown*, 398 F.3d at 909. Therefore, I will analyze Abney's claims against all defendants first under the *Farmer* standard and then determine whether some additional analysis should apply for those defendants who are "qualified professionals."

IV.

The Seventh Circuit's opinion in *Brown* lays out what a showing of a "substantial risk of serious harm" requires. To satisfy this requirement, Abney must show that he experienced a serious harm, and that "there was a substantial risk beforehand that the serious harm might actually occur." *Brown*, 398 F.3d at 913. Where a defendant has knowledge that a particular inmate poses a "heightened risk of assault" to the plaintiff, such a substantial risk may exist. *Id.* at 911 (citing *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)). Taking the facts in the light most favorable to Abney, there is evidence that D.F. sexually assaulted him; it is obvious that sexual assault is a serious harm. There is also evidence that D.F. had impliedly asked Abney if he would have sex with him, and when Abney refused D.F. stated that he was disappointed and would physically harm Abney.[8] Therefore, taking

---

[8] In his response to defendants' statement of facts, Abney contends that D.F. had a history of assaulting other TDF residents, and that he had a "criminal and IDOC history of sexually assaulting younger white males within the same age range as the plaintiff." However, while evidence of this history was hinted at during the earlier hearing, and would certainly be probative to establish whether defendants should have taken D.F.'s threats more seriously,

14

the facts in the light most favorable to Abney, there was a substantial risk before the September 4 incident that D.F. would seriously harm Abney.

The difficulty Abney faces is in the second prong of the *Farmer* analysis, showing that defendants were deliberately indifferent to his safety. This requires a showing that each defendant knew of and disregarded an excessive risk to Abney's safety; "the official must be both aware of the facts from which an inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 838; *Brown*, 398 F.3d at 913; *Riccardo*, 375 F.3d at 525. Although this is a subjective test, it may be proven through circumstantial evidence. *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") (internal citation omitted).

Here, taking the facts in the light most favorable to Abney, immediately following the August 11 incident Abney reported the incident to some of the defendants. The difficulty with Abney's allegation is that the evidence shows that, even if Abney took

---

Abney has presented no admissible evidence that this is true. Even were I to credit Abney's affidavit setting forth this evidence, Abney has not shown how he has personal knowledge of this history such that his testimony would be admissible. For purposes of this summary judgment motion I cannot consider these allegations.

D.F.'s threat seriously (and, taking the evidence in the light most favorable to Abney, it appears D.F. made good on his threat), Abney only reported to defendants that D.F. had threatened him "in a joking manner" and that he did not "feel comfortable" with the remark. The unrefuted evidence here is that Abney conveyed the threat to defendants as less than serious. This is particularly true in light of Dr. Jumper's unchallenged testimony that TDF residents frequently threaten one another with harm but do not follow up on these threats, and that residents frequently "test the waters" to determine if a roommate will engage in consensual sexual activity. Under these undisputed facts, Abney cannot show that any of the defendants drew the inference that a substantial risk of harm existed for Abney because of D.F.'s statements.[9] Therefore, I grant summary judgment to defendants on Abney's § 1983 claim.

V.

Because I find that, even taking the facts in the light most favorable to Abney, he cannot show a violation of his rights under

---

[9] In addition, as noted above, there are no facts in the record providing any evidence as to whether certain defendants were aware of any risk of substantial harm to Abney - there is no clear evidence that Monahan, Chankin or Clausen even saw the written report detailing D.F.'s threat. Summary judgment is appropriate as to these defendants because Abney has failed to show they even knew of his complaints or participated in the decision not to separate him from D.F. Further, to the extent that claims against Dr. Jumper should be assessed under the "professional judgment standard," summary judgment would be appropriate as well. Dr. Jumper has provided uncontested testimony that he assessed D.F.'s threats against Abney and determined, given his knowledge of residents at the facility, that they were not serious. Abney has not shown that this was a departure from accepted professional judgment. *See Youngberg*, 257 U.S. at 322.

16

the Fourteenth Amendment, I need not consider defendants' other arguments concerning qualified immunity or improper service to Watkins.[10] I therefore grant defendants' motion for summary judgment, and dismiss Abney's claim.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

**Dated:** September 29, 2006

---

[10] In addition, defendants note that some of Abney's responses to their statement of facts appear to raise an equal protection argument, asserting that defendants deliberately placed him at risk because of his sexual orientation (he alleges in his complaint that he is bisexual) and race (he is Caucasian). Abney has presented no evidence that defendants failed to protect him because of his sexual orientation or race. To the extent he uses this allegation to provide circumstantial evidence that defendants ignored evidence of a substantial risk of harm to him, he cannot prevail. Further, to the extent Abney is making a separate equal protection claim, that claim must fail because Abney has presented no facts to show that defendants treated heterosexual or non-Caucasian residents differently when they were at risk of harm or when they complained about threats from other residents. See Brown, 398 F.3d at 916 (citing McNabola v. Chicago Transit Auth., 10 F.3d 501, 513 (7th Cir. 1993)) (holding plaintiffs making equal protection claims must show they were treated differently from members of the unprotected class).